## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 25-22684-Civ-BECERRA/TORRES

LEX BARKER, an individual, ISS AVIATION
INC. (U.S.), a Wyoming corporation, and
INSTANT SECURITY SERVICE INC. (DE),
a Delaware corporation,

     *Plaintiffs,*

v.

CHEDDI JAGAN INTERNATIONAL AIRPORT
CORPORATION, a foreign corporation, THE
COOPERATIVE REPUBLIC OF GUYANA,
a foreign government, RAMESH GHIR, an
individual, JOHN DOE 1, an individual, and
JOHN DOE 2, an individual,

     *Defendants.*

_____/

### *ORDER ON MOTION TO DISMISS*

This matter is before the Court upon Defendants' Motion to Dismiss [D.E. 30].

The Plaintiffs have responded to the Motion [D.E. 46], to which the Defendants have

replied [D.E. 49]. The Motion, therefore, is ripe for disposition. After review of the

briefing, record, and relevant authorities, and for the reasons set forth below, the

Motion is **GRANTED** in part and **DENIED** in part.[1]

---

[1]     On November 14, 2025, the Honorable Jacqueline Becerra referred this matter to the Undersigned Magistrate Judge for disposition. [D.E. 43]. This Order is entered for administrative purposes. But any party objecting to the Order has leave to seek de novo review by filing an appeal of the Order under Local Rule 4, in which case the Court will treat the Order as a Report and Recommendation.

## I.  BACKGROUND

The Foreign Sovereign Immunities Act ("FSIA") shields foreign states and their instrumentalities from suit in American courts.  Congress enacted that default rule but with built in exceptions. It created exceptions for foreign sovereigns that choose to act as commercial actors—entering contracts, managing business arrangements, and dealing in goods and services available to private parties. Two of those exceptions are at issue here.

Lex Barker is a dual citizen of the United States and Guyana who built an aviation business from the ground up inside a Guyanese airport. For over two decades, he and his American companies operated out of a commercial hangar at the Cheddi Jagan International Airport under a license agreement with the airport's governing authority. They serviced government helicopters, supported the Guyanese Defense Forces, assisted in search-and-rescue operations, and transported goods and personnel across the Atlantic corridor between Florida and Georgetown. At the height of operations, they held FAA-registered aircraft, employed local workers, and held contracts with major helicopter companies.

Then, according to this complaint, a conspiracy took shape to destroy what Barker had built. Officials within the Guyanese government and airport authority— allegedly protecting their own drug-trafficking operations—systematically denied access to the hangar, blocked service personnel, and refused to approve improvements. Two separate attempts were allegedly made on Barker's life. In 2017,

2

the hangar doors were chained shut and Plaintiffs' aircraft were seized. Plaintiffs have been unable to recover that property since.

The named Defendants—the Cooperative Republic of Guyana, Cheddi Jagan International Airport Corporation, and its CEO—respond that none of this can be litigated in an American court. Their primary defense is sovereign immunity. They also claim that, even if jurisdiction lied here, Barker and his companies bring claims that are time-barred.

Relying on those exceptions, the present complaint alleges a series of claims for injuries committed against Barker and his companies, ISS Aviation Inc. (U.S.) ("ISS Aviation"), a Wyoming corporation, and Instant Security Service Inc. (DE) ("ISS"), a Delaware corporation. The claims include takings of property (expropriation), breach of contract, unjust enrichment, negligence, and attempted murder. [D.E. 1 at 9]. The named Defendants, Cheddi Jagan International Airport Corporation ("CJIA"), a Guyanese Corporation, the Cooperative Republic of Guyana ("Guyana"), Ramesh Ghir ("Ghir"), CEO of CJIA, deny all wrongdoing and move to dismiss the complaint under the FSIA.[2]

In the light most favorable to Plaintiffs as required for any analysis under Rule 12, the heart of this case focuses on a commercial agreement – an airport hangar license between an American company and a foreign airport authority – and the systematic campaign to destroy it regardless of the consequences. That agreement

---

[2]     The complaint also includes claims against two unnamed individuals, John Doe 1 and John 2, for their alleged role in the alleged attempted killing.

was entered into in 2003 between Barker and his business ISS, with Defendants Guyana, CJIA and Ghir.  They signed a Land License Agreement ("the Agreement") with CJIA to rent a hangar (the "CJIA Hangar"). [D.E. 1 at 1]. Barker and ISS later purchased the hangar in February 2011 [D.E. 1 at 20]. Barker's business began using the hangar and the commercial relationship, though rocky at times, proceeded.

In 2008, Barker and his companies entered into contracts with major helicopter companies, including Evergreen Helicopters, CHC Helicopters, and Erickson Helicopters "to provide logistics and support." [D.E. 1 at 18]. Plaintiff incorporated Global X, a Florida based company incorporated in Delaware, in 2008, ISS Aviation (Guyana) in 2013, and Plaintiff ISS Aviation (US) in 2018.

The CJIA Hangar was turned into an operations hub for Barker's companies for their business operations with the Guyanese government. These business ventures included helicopter support for military and law enforcement; mining companies; and wealthy individuals. Barker's companies provided business and government entities with different aircraft, parts and flights. They also assisted the Guyanese with search and rescue missions. [D.E. 1 at 2]. Specifically, in 2013, Barker used the CJIA Hangar to "provide initial support for helicopters engaged in discovery in the burgeoning Guyana oil industry and other developing projects." [D.E. 1 at 18]. Global X used the CJIA Hangar when it sold aircraft to the Guyanese Defense Forces (two sold in 2008), American and international companies, and chartered flights from Miami to international destinations. [D.E. 1 at 5]. Barker's companies regularly transported goods and personnel between the United States and Guyana, relying on

4

the CJIA Hangar. Plaintiffs' operations helped provide the Guyanese with "important national security assets" to help fight crime, *including* drug smuggling. [D.E. 1 at 18-9].

Between 2003 and the 2017, Plaintiffs also made several improvements to the CJIA Hangar, including the clean room, where Plaintiffs performed inspections of Guyanese Defense Force helicopters. The CJIA Hangar also served as a storage facility. In 2018, ISS Aviation (US) acquired the rights to the CJIA Hangar. [D.E. 1 at 3].

But this commercial relationship soured. [D.E. 1 at 2]. Seeing Plaintiff Barker and his companies' operations "as a threat to their [drug smuggling] operations," [D.E. 1 at 2], certain "corrupt officials" of Guyana, the CJIA, and Ghir entered into a conspiracy with their drug trafficker partners, notably Khamraj Lall, to disrupt and remove Plaintiffs' operations. This was purportedly in order to protect their alleged "smuggling operations." [D.E. 1 at 2].

For example, Defendants refused to approve necessary improvements to the CJIA hangar, which Barker offered to fund [D.E. 1 at 23], frustrating his ability to effectively operate out of it. Plaintiff alleges that CJIA personnel continuously limited Barker's and his employees' access to the CJIA Hangar. [D.E. 1 at 4, 8]. In 2010, Lall even allegedly bid to purchase the CJIA hangar in a failed effort to evict Barker and his operations from Guyana. [D.E. 1 at 24-25].[3]

---

[3]     Plaintiffs additionally allege in support of their conspiracy claim that the Defendants corrupt actions included providing favors to Lall through sweet-heart deals hangar leases bereft of a paper trail. [D.E. 1 at 3].

On November 22, 2014, Lall was arrested in Puerto Rico for trafficking hundreds of kilograms of cocaine from Guyana to New York. According to the complaint, Lall's arrest served as a major component of Defendants' drug smuggling operations. In 2018, Khamraj Lall was convicted in the United States District Court for the District of New Jersey on one count of conspiracy to money launder, three counts of money laundering, one count of conspiracy to distribute five or more kilograms of cocaine.  (He is currently serving a 13 year sentence in the United States for cocaine smuggling).

Plaintiffs allege that Defendants engaged in retaliatory measures after Lall's arrest, which they pinned on Barker. For example, Defendants Guyana, CJIA, and Ghir allegedly chained the doors to the CJIA Hangar in 2017. [D.E. 1 at 3]. This action completely severed Plaintiffs' business operations in the region. Plaintiffs responded at first by engaging in several fruitless attempts to reclaim the seized property between 2017 and 2021. [D.E. 1 at 33; D.E. at 46 12, 19].  Despite these efforts, Plaintiffs have been unsuccessful in regaining possession of the assets within the CJIA Hangar: a Cessna 402 and a Bell 206 Jet Ranger [D.E. 1 at 7], or the aircraft parts held inside ("the assets"). [D.E. 1 at 3].

Plaintiff also claims that the alleged conspiracy to protect Guyanese drug trafficking operations went as far as Defendants' henchmen making two separate attempts on Plaintiff Barker's life. First, in 2004, Plaintiffs claim that Defendants attempted to sabotage Plaintiff ISS (DE)'s Cessna 402 during a flight carrying four people, including a woman and child, from CJIA to Ft. Lauderdale, FL. [D.E. 1 at 27].

6

According to the complaint, U.S. inspectors identified plastic bags wrapped around each engine's air intake system [D.E. 1 at 27]. So the theory goes that Defendants attempted to starve the engine of air, which can lead to several serious issues, including midair engine failure. [D.E. 1 at 28]. Had the operation been successful, the heat of the engine would have evaporated the only evidence, the plastic bags. [D.E. 1 at 28]. Plaintiff blames an agent for a rival aviation contractor in conspiracy with Defendants or a CJIA employee, John Doe 1, for placing the bags, since only Defendants could access the Cessna 402. [D.E. 1 at 28].

The second alleged murder attempt took place years later in 2012. As Plaintiff Barker conducted business at the CJIA, Defendant Ghir and John Doe 2 allegedly removed certain lug nuts from Barker's vehicle's tire. Had he not pulled over to put air in his tire, Plaintiff Barker's vehicle would have lost the tire in transit, and Barker would have likely suffered serious harm or death. [D.E. 1 at 28]. Like the Cessna plot, Plaintiffs argue that only the Defendants could have sabotaged the automobile, as only they had access to the restricted area where it was parked. [D.E. 1 at 49].

Finally, Plaintiffs claim that Defendants regularly harassed them. Defendants purportedly limited their access to the hangar. [D.E. 1 at 29]. Defendants allegedly refused to allow service workers to access their aircraft, which disrupted time sensitive operations, including in the United States, led to flight cancellations,

7

disrupted drug smuggling operations, and frustrated business relationships between the Plaintiffs and their third-party clients. [D.E. 1 at 29-30].[4]

Defendants' alleged wrongful conduct made it impossible for Plaintiffs to use the CJIA hangar under the Agreement, which Agreement Plaintiffs relied upon to expand their operations and invest large sums of resources. [D.E. 1 at 31]. These actions proximately caused (and continue to cause) Plaintiffs injuries, including lost profits from cancelled operations, failed deals to sell aircraft parts and aircrafts, and other ventures. [D.E. 1 at 31]. Barker claims he and his businesses lost millions because of Defendants' alleged harassment campaign. [D.E. 1 at 31]. As far as Plaintiffs understand, Guyana currently controls the CJIA Hangar and the contents within it.

Based on these allegations, Plaintiffs seek relief in this American forum under theories of breach of contract, unjust enrichment, negligence, takings of property in violation of international law, and attempted extrajudicial killing in violation of the Torture Victim Protection Act. [D.E. 1 at 40-51]. Plaintiffs sue here because they allege that corruption in the Guyanese court system leaves them with no recourse through the Guyanese legal system. [D.E. 1 at 3].

---

[4]     To further harm Barker, Plaintiffs claim that CJIA and Guyana assisted Barker's ex-wife in filing a family lawsuit in Florida, which lasted from 2014 until 2020. This lawsuit involved extensive use of subpoenas, which allegedly caused the disclosure of confidential information. [D.E. 1 at 32]. And out of fear, Barker has not returned to Guyana since 2014. He lives full-time in Florida and has not renewed his Guyanese passport. [D.E. 1 at 32].

On September 15, 2025, Defendants filed a motion to dismiss for lack of subject matter jurisdiction, failure to state a claim, and improper venue, pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 12(b)(3), respectively. [D.E. 30 at 1]. The thrust of their argument is that these claims are barred as Guyana and these related Defendants are immune from suit. Further the allegations in the complaint do not sustain plausible legal claims or are otherwise time barred.

## II.    ANALYSIS OF IMMUNITY DEFENSE

We will start with the primary issue raised in the motion. Defendants claim that this Court does not have jurisdiction because Guyana and CJIA are immune from suit in the United States under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602-11 ("the FSIA"). Guyana is a foreign state in accordance with 28 U.S.C. § 1603(a), CJIA is an agency or instrumentality in accordance with 28 U.S.C. § 1603(b). [D.E. 30 at 2]. By its terms, Defendants conclude, the FSIA presumptively renders them immune from any lawsuit in this Court that challenges sovereign actions they took in pursuit of a governmental purpose – the operation of a public international airport. And there is certainly no doubt that the FSIA "creates a baseline presumption of immunity from suit." *Federal Rep. of Germany v. Philipp*, 592 U.S. 169, 176 (2021).

But Plaintiffs contend that two exceptions to the FSIA, 28 U.S.C. § 1605(a)(2), the commercial activity exception, and 28 U.S.C. § 1605(a)(3), the expropriation exception, defeat Defendants' immunity claim [D.E. 46 at 9-14]. Foreign States are immune from suit "*unless* an FSIA statutory exception applies." *Butler v. Sukhoi Co.*,

579 F.3d 1307, 1312 (11th Cir. 2009); *see* 28 U.S.C. § 1604; *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 610 (1992). The Plaintiff bears the burden to rebut the presumption of immunity under the FSIA. *See Butler*, 579 F.3d at 1312-13 ("[T]o establish subject matter jurisdiction under the FSIA, the plaintiff must overcome the presumption that the foreign state is immune from suit by producing evidence that the conduct which forms the basis of [the] complaint falls within one of the statutorily defined exceptions.") (internal quotations, citations omitted). But "[w]here a party . . . has asserted facts suggesting that an exception to foreign sovereign immunity exists, the party arguing for immunity . . . bears the burden of proving by a preponderance of the evidence that the exception does not apply." *Aquamar, S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1290 (11th Cir. 1999) (citations omitted).

The parties' arguments here can be reduced to a narrow threshold question: when a foreign airport authority signs a commercial lease with American companies, accepts performance under that lease for nearly two decades, and then seizes the leaseholder's property through what the complaint characterizes as a retaliatory campaign—is that sovereign conduct or commercial conduct? The FSIA answers that question directly. A foreign state forfeits immunity when it acts not as a regulator exercising sovereign authority, but as a private party engaged in commerce. *Weltover,* 504 U.S. at 614. On this record, Defendants acted as commercial actors throughout.

### A.   *Defendants Are Not Immune under the FSIA Based on the Commercial Activity Exception*

Plaintiffs first argue that the "commercial activity" exception excepts the FSIA from immunizing Defendants from suit in federal court. Foreign sovereign immunity shall not apply in any case:

> [I]n which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

Plaintiffs have only alleged injuries based on actions that clearly occurred outside the United States, so we need only analyze the third clause. We must consider whether the challenged allegations are (1) "based upon . . . an act outside the territory of the United States" (2) "in connection with a commercial activity of [Guyana]" that (3) "cause[d] a direct effect in the United States." *Id.*

Under the FSIA, a "commercial activity" is an action carried out as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). Yet, the statute itself provides little guidance as to how to determine "commercial activity." *See Weltover*, 504 U.S. at 612; *Texas Trading & Mill Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 302 (2d Cir. 1981) ("A law described by its draftsmen as providing only 'very modest guidance' on issues of preeminent importance."), *overruled on other grounds, Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan*, 582 F.3d 393 (2d Cir. 2009) "The first sentence simply establishes

11

that the commercial nature of an activity does not depend upon whether it is a single act or a regular course of conduct; and the second sentence merely specifies what element of the conduct determines commerciality (i.e., nature rather than purpose)." *Texas Traving*, 647 F.2d at 302.

The FSIA sought to codify the judicially recognized "restrictive" theory, which restricted a state's immunity to those acts only a sovereign can exercise. *Id.* ("[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it[,]" the foreign state's sovereign immunity is forfeited.); *see, e.g., Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 704 (1976) (before the FSIA's enactment in 1976, the Supreme Court recognized that when a foreign state "exercise[s] only those powers that *can* also be exercised only by private citizens[,]" it engages in commercial activities); *Republic of Hungary v. Simon*, 604 U.S. 115, 131 (2025) ("To the extent the Act permits litigation against foreign states, it usually requires that the litigation be premised on the foreign state's private, commercial conduct. That is because the FSIA 'largely codifies' the restrictive theory of sovereign immunity, which shields foreign states from being sued for their public acts. Courts should 'take seriously the Act's general effort to preserve a dichotomy between private and public acts.'") (quoting *Phillips,* 592 U.S. at 183).

Courts must thus look at the type of action undertaken by the foreign entity, not the motive for carrying it out:

> [T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type*

of actions by which a private party engages in 'trade and traffic or commerce[.]'

*Weltover*, 504 U.S. at 614 (citing Black's Law Dictionary 270 (6th ed. 1990)). "Whether a state acts 'in the manner of' a private party is a question of behavior, not motivation." *Saudi Arabia v. Nelson*, 507 U.S. 349, 359 (1992); *see, e.g., Rush-Presbyterian-St. Luke's Medical Center v. Hellenic Republic*, 877 F.2d 574, 578 (7th Cir. 1989) ("If a private person could have engaged in the *same type* of activity, then the sovereign has presumptively engaged in 'commercial activity' within the meaning of the FSIA; however, if no private party could have engaged in the challenged conduct, then the conduct is a sovereign act, and the foreign state is immune from suit.").

While this analysis is more straightforward when determining whether a tortious act is of the kind suitable to a private party, contract analysis is necessarily more complicated. *Saudi Arabia v. Nelson*, 507 U.S. at 359. Governments may find themselves serving as parties to the same types of contracts suitable to a private person (e.g., a land lease agreement), but their activity may be more governmental in nature when they deal in goods or services available only to sovereign nations. *Id.* Examples include contracts in which a sovereign permits land exploitation for mineral or animal resources, *id.*, or employment contracts issued to public employees (e.g., diplomats, soldiers, civil servants).

We must therefore consider whether Guyana and CJIA dealt (1) in a manner and (2) concerning goods or services available to private persons. We believe they did.

13

### 1.  *Operating an Airport Can Be a Commercial Activity*

Defendants boldly maintain that Defendants Guyana and CJIA are immune because running an airport, and managing hangar operations in particular, are governmental in nature [D.E. 30 at 5, 6]. To put it simply, private persons *cannot* run international airports. "Just as in the United States, running a major international airport is not [a commercial activity]." [D.E. 30 at 6]. Defendants run into an immediate problem, however, because it is only true that *most* major commercial airports in the United States are public operations. But some private entities do run airports, even in the United States. At least one major airport in the United States, Luis Muñoz Marín International Airport ("SJU"), San Juan, Puerto Rico, is operated by AeroStar Airport Holdings ("Aerostar"), a privately held limited liability company in a public-private partnership. Even more, Aerostar's two owners are foreign entities: Grupo Aeroportuario del Sureste ("ASUR"), a publicly traded company on the Mexican Stock Exchange and New York Stock Exchange, holds a 60% stake, while Public Sector Pension Investment Board ("PSP Investments"), a Canadian pension company, holds the remaining 40%, which it acquired from Oaktree Capital Management, L.P. ("Oaktree"), in 2017.[5]

Further, Defendants cannot argue that CJIA is a major airport while SJU is not. Both provide domestic and international flights chartered by the major airline

---

[5] *PSP Investments and ASUR acquire 50% stake in Aerostar, operator of San Juan Airport*, PSP, https://www.investpsp.com/en/news/psp-investments-and-asur-acquire-50-stake-in-aerostar-operator-of-san-juan-airport/ (last visited March 5, 2026).

14

companies. Both serve as the largest airport in their respective geographic area. CJIA only operates around 15 commercial departures per day, according to its own website.[6] SJU, on the other hand, facilitates more flights just to and from *Orlando* each day. In total, SJU manages nearly one hundred commercial flights per day, more than CJIA manages in a week. There is thus evidence before us that foreign-owned private companies currently operate major airports within U.S. territory, and so it is difficult to find that overall operation of an airport is per se a sovereign activity.

The same conclusion follows from European practice. For example, London Heathrow Airport, the primary airport in the United Kingdom, has been privately owned and operated by Heathrow Airport Holdings ("Heathrow Holdings") since 1985. Heathrow Holdings itself has been purchased and sold by Spanish and Saudi Arabian firms. In Rome, Aeroporto internazionale di Roma-Fiumicino "Leonardo da Vinci" ("FCO"), Rome's primary airport, is operated by Aeroporti di Roma S.p.A., a privately held subsidiary of Mundys, a publicly traded company on the Borsa Italiana (Italy's stock market) until 2022. At least one report concludes that 16.9% of airports were wholly private as early as 2016, and the industry is generally trending upward.[7] So, it turns out that operating an airport is the *type* of activity available to private persons, which concern "goods" available to private persons.

---

[6] Description of CJIA's daily departures, https://cjairport-gy.com/departures/ (last visited March 5, 2026).

[7] *The Ownership of Europe's Airports 2016*, Airports Council International https://www.aeroport.fr/uploads/documents/ACI%20EUROPE%20Report_The%20Ownership%20of%20Europes%20Airports%202016.pdf.

Nevertheless simply finding *an* activity to be a commercial activity is not enough to defeat immunity under the FSIA. We must also conclude that the legal claims at issue are "based upon" the commercial activity. "We look to the 'elements of a claim that, if proven, would entitle a plaintiff to relief.'" *Africa Growth Corp. v. Republic of Angola*, No. 21-11136, 2023 WL 3590409, *3 (11th Cir. May 23, 2023) (quoting *Saudi Arabia*, 507 U.S. at 357). That is, we must "focus on the 'core' of the suit itself—the foreign state's 'acts that actually injured' the plaintiff." *Id.* (quoting *OBB Personenverkehr AG v. Sachs,* 577 U.S. 27, 33 (2015)); *see also* Black's Law Dictionary (11th ed. 2019) (defining "gravamen" as "[t]he substantial point or essence of a claim, grievance, or complaint."); *cf.* (*Moses v. Air Afrique*, No. 99-CV-541 (JG), 2000 WL 306853, at *3 (E.D.N.Y. Mar 21, 2000)) (finding that Air Afrique had sufficient contacts with the United States by selling airline tickets for travel between the Ivory Coast and the United States, but finding that fact immaterial because the plaintiff's claim was based upon an alleged theft by Air Afrique employees, not the ticket sale).

The core of Plaintiffs' claims falls under the commercial activity of airport hangar operations. Defendants do not dispute that Barker and ISS rented, used, and ultimately purchased the CJIA Hangar, which they had access to through the Agreement. Even though operating an airport is not *per se* a sovereign activity, we consider whether serving as a party to a lease agreement does constitute a commercial activity. It does. *See Fagot Rodriguez v. Republic of Costa Rica*, 297 F.3d 1, 6 (1st Cir. 2002) ("[E]ntering into a contract for lease of property constitutes

16

'commercial activity.'"); *Samco Global Arms, Inc. v. Atria*, 395 F.3d 1212, 1216 (11th Cir. 2005) ("We readily conclude that the 1985 contract constituted a commercial activity under the FSIA. Our Circuit has held that where the activity at issue involves a government's contract for purchase and sale of goods, the activity is commercial, and not sovereign.") (citing in part *Practical Concepts, Inc. v. Republic of Bolivia,* 811 F.2d 1543, 1549 (D.C. Cir. 1987) ("[A] contract between a foreign state and a private party for the purchase of goods *or services* may presumptively be, but is not inevitably, commercial activity.")) (emphasis added) (discussed further below).

One could say, of course, that such private operations could only be possible if the local sovereign authorized their existence. True enough. But we are not debating whether sovereigns have the sole power to determine which entities can and cannot do business in their territory. When we are considering whether Guyana and CJIA have entered into a commercial business arrangement with private parties to carry out business operations at an airport, we are in a categorically different realm than less objectionable regulatory activities. Having made that choice, the governmental entity cannot deny it is then engaged in commercial activities.

In sum, when a foreign country serves as a party to a contract dealing in goods or services available to private persons, it engages in commercial activity. When it prematurely terminates the lease, it engages in a breach, akin to any private contracting party. Judge Ginsburg (later Justice Ginsburg) analyzed this precise issue in *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543 (D.C. Cir. 1987). Practical Concepts, Inc. ("PCI") sought recovery from the Republic of Bolivia after

17

Bolivia reneged on a contract in which PCI would provide Bolivia with technical assistance and consulting services to modernize rural areas in exchange for money. 811 F.2d at 1545. Bolivia funded the project through earmarked funds provided by the United States Agency for International Aid ("AID"). *Id.* After Bolivia learned AID cancelled its funding, Bolivia cancelled its agreement with PCI one year before the term's end. *Id.* PCI sued in the United States for breach of contract. *Id.* The district court found Bolivia immune under the FSIA "because the contract between Bolivia and PCI included numerous terms which only a sovereign state could perform, and which no private firm or individual going into the market place could ever offer." *Id.* (internal quotations omitted) (citations omitted). The D.C. Circuit overruled. Writing the panel opinion, Judge Ginsburg explained: "It is more sensible, and faithful to the probable intent of Congress, we believe, generally to center on the basic exchange (*e.g.*, the sale of goods or services), not on the facilitating features (*e.g.*, expediting entrance of personnel and supplies), in determining whether an obligation qualifies as a 'commercial activity' for FSIA purposes." *Id.*

The same holds true here. Just because Guyana may have acted in part as a governmental actor, such as by regulating air traffic, this lawsuit is based on a breach of contract concerning the exchange of goods—money for access to property. One need only look to the Agreement itself to see the point:

> The Licensor, its officers, servants or agents shall have full and free access for inspection purposes during normal business hours and in the presence of the Licensee or a representative of the Licensee to any and every part of the premises and shall have access to all equipment, stores, furnishings, and movables therein, for the purpose of inspecting the same. The Licensor agrees to give the Licensee at least 5 days' notice in

18

advance of its intention to inspect the licensed premises, it being expressly understood and agreed, however, that in cases of emergency, the Licensor, its officers, servants or agents shall at all times and for all purposes have full and free access to the said licensed premises.

[D.E. 30, Exhibit 4, at § 6.2]. Furthermore, the Agreement states, "In addition to the license hereby granted, the Licensor grants to the Licensee the rights of access, ingress and egress through other parts of the said airport which is necessary for the proper execution of Instant Security, Ins.'s operations; such access must be authorized by the Licensor." [D.E. 30, Exhibit 4, at § 2.2]. CJIA, represented by its CEO, served as the "Licensor" to the agreement. [D.E. 30, Exhibit 4]. The alleged chaining of the hangar, the access limitations imposed, and the seizure of Plaintiff's property, if ultimately found to be true, constitute actions arising from the license agreement, not simple airport maintenance on the part of a sovereign government. Defendants thus engaged in a "commercial activity" under § 1605(a)(2) for purposes of these contractual claims, as well as the related tortious claims that arise under the parties' agreements including the seizure of the hangar and the property contained therein.

### 2. *There was a "Direct Effect" in the United States*

Even if Defendants engage in a commercial activity, we must also decide whether the alleged breach caused a "direct effect" in the United States. 28 U.S.C. § 1605(a)(2). "[A]n effect is direct if it follows as an immediate consequence of the defendant's activity." *Weltover*, 504 U.S. at 618. As the Second Circuit recognized in *Texas Trading & Mill. Corp.*, "the most difficult aspect of the direct effect clause

19

concerns its phrase, 'in the United States.'" *Texas Trading & Mill. Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 312 (2d Cir. 1981). "[J]urisdiction may not be predicated on purely trivial effects in the United States." *Weltover*, 504 U.S. at 618, *cited in Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213 (11th Cir. 2018).

Moreover, "commercial-activity jurisdiction cannot exist unless the commercial activity that forms the basis for jurisdiction also serves as the predicate for the plaintiff's substantive cause of action." *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101, 1106 (D.C. Cir. 2001), *vacated in part*, 320 F.3d 280 (D.C. Cir. 2003) (citing *Saudi Arabia*, 507 U.S. at 357-358). A court must focus on the "core" of the lawsuit. "[W]e must identify the conduct upon which the suit is based by looking at the particular conduct that constitutes the 'gravamen' of the suit, *i.e.,* the 'core' of the suit." *Global Marine Exploration, Inc. v. Republic of France,* 33 F.4th 1312, 1324 (11th Cir. 2022) (quoting in part *Devengoechea,* 889 F.3d at 1222).

Some cases lend themselves more easily to analyze direct effects than others. Surely, if someone suffers a physical injury in the United States, the effect is direct. *See, e.g., Harris v. VAO Intourist Moscow*, 481 F. Supp. 1056 (E.D.N.Y. 1979) (death from a hotel fire); *Upton v. Empire of Iran*, 459 F. Supp. 264 (D.D.C. 1978) (injury from a roof collapse). But a corporate injury is usually limited to financial harms. Since corporations are "no more than a series of conduits, filtering profits or loss . . . to its shareholders who may themselves be fictional entities as well," *Texas Trading,* 647 F.2d at 312, effects can always be construed to be indirect. Further, "locating the

20

site of the injury . . . is an enterprise fraught with artifice." *Id.* Rather than establishing a rigid understanding of "direct effect" or "in the United States," we must be mindful of Congress's policy aims in codifying the commercial activity exception: to provide "access to the courts to those aggrieved by the commercial acts of a sovereign." *Id.* (internal quotations omitted) (citations omitted). Perhaps we will not come to a rock-solid definition for the operative terms, but Congress's intent in this regard was clear. *See id.* at 313 ("Before the FSIA, plaintiffs enjoyed a broad right to bring suits against foreign states, subject only to State Department intervention and the presence of attachable assets. Congress in the FSIA certainly did not intend significantly to constrict jurisdiction; it intended to regularize it. *See House Report* at 6605-06.").

Consequently, speculative claims by a corporation citing losses in the United States are not enough to satisfy the "direct effect" burden. *Samco,* 395 F.3d at 1216. In *Samco* the Eleventh Circuit's analysis of this prong is telling.  There an arms company Longlac Enterprises Corporation, a Panamanian Corporation ("Longlac"), contracted with Honduras to import and deal firearms and explosives in the region. Longlac imported weapons free of tax and other fees; Honduras reserved the right of first opportunity to purchase the imported goods in return. *Id.* If Honduras declined, Longlac could freely sell to third parties. *Id.* The Honduran military stored the imported goods during the period between import and sale. *Id.* In 1994, the Honduran Liberal Party, under the leadership of President Carlos Roberto Reina Idiáquez, took power after defeating the National Party of Honduras. Domestic criminal cases

21

against the Honduran Armed Forces for illegal trafficking of Longlac's arms followed the change in power, and the Honduran courts ultimately ordered that the arms in question be returned to Longlac. *Id.* Longlac's attorney subsequently received an attorney's lien for unpaid fees related to the litigation after the change in power, which in total amounted to approximately one-tenth the value of the arms. *Id.* Longlac failed to recover the goods. *Id.*

Samco previously served as one of the third parties that purchased Longlac's imported goods when the prior Honduran regime exercised its right of refusal. *Id.* The deals between Longlac and Samco occurred in Miami, Florida. In 2000, Samco purchased Longlac's claims and interest in the 1985 contract. Samco sued Honduras in this District under the FSIA for breach of the 1985 contract. But the district court dismissed the case after finding Honduras immune under the FSIA. On appeal, the Eleventh Circuit affirmed the district court's dismissal. *Samco*, 395 F.3d at 1218.

The Eleventh Circuit found Samco's alleged harms—allegations of lost profits from future sales, inability to ship goods, costs associated with retaining said goods, and reputational harm—too "indirect and speculative" to constitute a "direct effect . . . in the United States." *Id.* at 1217. A contract between a sovereign and a non-U.S. citizen or entity that only required performance by the sovereign within the sovereign's territory, concerned goods manufactured other than in the United States, was negotiated and executed within the sovereign's territory, and otherwise made no reference to the United States cannot not have a direct effect in the United States for

22

purposes of a FSIA exception. *Id.* at 1218. Further, the assignee's U.S. ties (i.e., Samco's ties) were not enough to meet the burden on its own. *Id.*

By contrast, when American corporations are deprived of owed consideration due in the United States, a more concrete case for a direct effect in the United States exists. Take *Texas Trading Mill. Corp.*, where the Federal Republic of Nigeria ("Nigeria") reneged on multiple agreements to purchase large quantities of Portland cement to build infrastructure necessary to support the nation's booming oil-export industry. 647 F.2d at 302. After cement deliveries clogged Nigeria's commercial ports, realizing the knock-off effects on the larger import industry, Nigeria refused to accept the cement shipments. *Id.* The Second Circuit concluded (1) that Nigeria had engaged in commercial activities by contracting for the cement and (2) that Nigeria's breach directly affected the United States, since Nigeria owed money in the United States and each plaintiff in the case was an American corporation. *Id.* at 312; *see also Weltover*, 594 U.S. at 619 ("Because New York was thus the place of performance for Argentina's ultimate contractual obligations, the rescheduling of those obligations necessarily had a 'direct effect' in the United States.").

Similarly, the Eleventh Circuit found in *Devengoechea* that a reasonable expectation of profits in the U.S. prior to a defendant's breach satisfied the direct effect burden. Ricardo Devengoechea, a U.S. national living in the U.S., inherited a large collection of Simon Bolívar treasures, including a locket of his hair. *Devengoechea*, 889 F.3d at 1215. Bolivar entrusted the collection to Devengoechea's ancestors soon before his death. *Id.* The collection was of substantial financial and

23

cultural value, particularly in the South American countries Bolivar helped liberate: Venezuela, Bolivia, Colombia, Ecuador, Peru, and Panama. Soon after Venezuela learned of Devengoechea's Simon De Bolívar collection it began to show an interest in owning its contents. *Id.* at 1217. Venezuelan officials contacted Devengoechea to valuate and potentially purchase the Bolivar collection. After Venezuelan officials persuaded Devengoechea to fly his collection to Venezuela for appraisal and purchase, which Venezuela chartered, it refused to return the collection. *Id.* After five years of failed efforts to reclaim the collection, Devengoechea sued in this court. The District Judge denied the motion to dismiss the case under the FSIA based on the commercial activity exception. *Id.* at 1230.

On appeal, the Eleventh Circuit considered the type of action that Venezuela performed, and found that because Venezuela presented itself to Devengoechea as an interested party willing to negotiate, examine, transport, and return the property if no deal was reached, Venezuela engaged in a "commercial activity." *Id.* at 1220-1223. It then found the suit was "based upon" a commercial activity: "Venezuela's failure to return the Bolívar collection to Devengoechea or to pay him for it." *Id.* "Venezuela's failure to pay for or return the Collection constitutes the alleged breach, and in the unjust-enrichment claim, Venezuela's failure to pay for or return the Collection to Devengochea . . . caused Venezuela's unjust enrichment." *Id.*

Having satisfied the commercial activity requirements, the Eleventh Circuit then addressed whether there was a direct effect in the United States. *Id.* at 1124. It found that it did, relying in part on the rule established in *Samco*, that a "direct effect"

24

occurs whenever "monies or goods [are] due in the United States." *Id.* at 1225 (citing *Samco,* 395 F.3d at 1217). And viewing the facts in the light most favorable to the complainant, had the deal been consummated the monies owed were likely to have been due in the United States. Otherwise, Venezuelan officials should have returned the collection – to the United States. *Id.* at 1225-6. These factors all pointed in the direction of a direct effect in the United States.  Additionally, the Court considered Venezuela's knowledge of Devengoechea's residence in the United States, that Devengoechea held the Collection in the United States, and several interactions between Venezuela and Devengoechea in Florida. *Id.* at 1226.

Analyzing the reasoning of these cases, the facts here align more with cases finding a "direct effect." Plaintiffs comprise American companies and an individual with dual citizenship in the United States and Guyana. Plaintiffs conducted business in the United States, Guyana, and other foreign countries. They allege the Defendants improperly breached a license agreement, and later converted Plaintiffs' property, by blocking them from accessing their hangar and refusing to return their property from inside the hangar. That property would presumably have been returned to the United States. So Plaintiffs have a strong point that a direct effect is satisfied on two grounds: "(1) severing the flow of commercial activity between the United States and Guyana for Plaintiff Barker's Florida-based helicopter business, Global X, as well as Plaintiffs Barker and ISS Aviation (U.S.) (2) and causing immediate financial losses to U.S.-based entities, Plaintiffs Barker and ISS Aviation (U.S.)." [D.E. 46 at 7].

Plaintiffs also rest their argument on the decision in *McKesson HBOC*, in which the D.C. Circuit found the direct effect burden satisfied when Iran's Pak Dairy blocked a U.S. company from receiving dividends and "cut off . . . flow of capital, management personnel, engineering data, machinery, equipment, materials and packaging between the [American and Iranian] companies, as well as the abrupt end of [plaintiffs]'s role as an active investor [in the foreign company]." *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101, 1105 (D.C. Cir. 2001); [D.E. 46 at 7-8]. Plaintiffs contend that "Defendants' seizure similarly terminated the flow of aircraft, personnel, and capital between Florida and Guyana." [D.E. 46 at 8 (citing [D.E. 1 ¶ 148].

We have not found a case in the Eleventh Circuit indistinguishable from *McKesson HBOC*, yet the Eleventh Circuit's holdings in *Devengoechea* and *Samco* leave some room to question whether the Eleventh Circuit understands the "direct effect" requirement to be as relaxed as the D.C. Circuit. In any event, though it is a close question, Plaintiffs have the better side of the argument. After all we must only find that Plaintiffs' complaint and its allegations of harm to be plausible. Plaintiffs' losses were surely less direct than *Weltover* or *Devengoechea* as Plaintiffs do not allege that Defendants previously agreed to return any goods to the United States or pay any monies within it. But, unlike *Samco*, the losses alleged are more than speculative—lost registration through the Federal Aviation Administration ("FAA") for its aircraft, disruption in business (both in the United States, with the government of Guyana itself, and elsewhere), lost third-party contracts, and financial losses

26

suffered in Florida.[8] [D.E. 46 at 8-9]. Considered in their totality, Plaintiffs' alleged injuries are tangible enough to satisfy our Circuit's definition of a direct effect on the United States under FSIA.

This is particularly true with the consequential damages sought for the unjust enrichment claims, as well as the conversion claims, that relate to the property that Plaintiffs maintained in the Guyana hangar.  Plaintiffs allege that, after the initial breach through the padlocking of the hangar doors in 2017, and despite several years' worth of efforts to retrieve their aircraft, Defendants never returned that property back to Plaintiffs. At the time of this alleged conversion, Defendants surely understood that at minimum Barker's business entities – all based in the United States – would be expecting to receive the returned property in the United States. So by depriving them of the property for this extended period, Defendants were plainly on notice that this misfeasance would have a direct effect on United States commercial interests.

And this understanding was cited by the Eleventh Circuit in *Devengoechea* as a key reason why a direct effect was established in that case. 889 F.3d at 1225 ("when we read the allegations of Devengoechea's complaint in the light most favorable to

---

[8]     For instance, Plaintiffs regularly chartered flights to and from the United States. Not only could Plaintiffs not effectively use the CJIA hangar once it was seized, but they also could not use the aircraft within it, since those required regular inspections to retain FAA certification. 14 CFR § 135.25(a)(1) (requires certification for all aircraft operated in the United States by a FAA approved certificate holder (i.e., a certified pilot); FAA 8130.2J Chg 1 (10/27/2023) (registration requires a physical examination of the aircraft to receive an airworthiness certificate). These are all direct effects that followed from the alleged conversion of Plaintiffs' property.

27

Devengoechea, we must conclude that payment for *or return of the Collection at issue* was necessarily to occur in the United States.") (emphasis added). The panel opinion in fact cited with approval a similar case from the D.C. Circuit where an expectation that goods would be returned to the United States satisfied the direct effect requirement. *See De Csepel v. Republic of Hungary,* 714 F.3d 591, 601 (D.C. Cir. 2013) (finding direct effect shown even though complaint did not expressly allege that the return of disputed artwork was to take place in the United States, because "this is fairly inferred from the complaint's allegations that the bailment contract required specific performance—i.e., return of the property itself—and that this return was to be directed to [the plaintiffs] Hungary knew to be residing in the United States.").

Accordingly, Plaintiffs here have satisfied their burden of showing that Defendants' commercial activity resulted in plausible direct effects on U.S. interests. Defendants knew that the breach of the license agreement would have direct financial effects on the U.S. entities, that the property that they allegedly converted would have to be returned to the United States, and that interference of commerce caused by their wrongful conduct would affect Plaintiffs' U.S.-based operations.  Thus the motion to dismiss for lack of subject matter jurisdiction should be Denied as to these claims to the extent they arise from the commercial activities that Defendants engaged in and upset through the breach of the Agreement and the unjust enrichment/conversion claims over Plaintiffs' property.  *See, e.g., Devengoechea,* 889 F.3d at 1219 (affirming denial of motion to dismiss breach of bailment agreement and unjust enrichment claims in part for failing to pay monies to plaintiff in Florida or

28

failing to return plaintiff's property in Florida, based on commercial activity exception); *De Csepel*, 714 F.3d at 596 (affirming denial of motion to dismiss bailment, conversion, constructive trust, accounting, declaratory relief, and unjust enrichment claims over failure to return seized property to United States, under the commercial activity exception).

### B. *There is no Expropriation-Based Claim*

Plaintiffs' opposition to the motion to dismiss also relies on their "takings" claim, principally alleged in Count I, which purports to be in accord with § 1605(a)(3) – the expropriation exception. Unlike the commercial activity exception of § 1605(a)(2), the expropriation exception governs sovereign, not private, acts. *Devengoechea*, 899 F.3d at 1228. The Eleventh Circuit has recognized the expropriation exception to itself be an exception to the "restrictive theory" as it excepts immunity even when the foreign sovereign has engaged in a public act. *Id.* at 1229. Under the expropriation exception, foreign sovereigns will not have immunity when:

> [R]ights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

29

28 U.S.C. § 1605(a)(3). Since no property in the United States is in question, only the second clause requires analysis: property rights taken by a foreign state while engaged in commercial activity in the United States.

There are, however, several problems with Plaintiff's reliance on this exception. In the first place, the basis of the takings claim, as set forth in the response to the motion, is the expropriation by Defendants of the hangar and the aircraft contained therein that Barker and ISS-DE owned. This expropriation took place in 2017. [D.E. 46 at 11]. The motion asserts that the expropriation exception applies for this conduct because "International law prohibits a sovereign from expropriating the property of another state's nationals without payment of just compensation." [D.E. 46 at 10].

The complaint itself, however, materially clarifies the story at least with respect to the hangar. In 2017, Plaintiff Barker's company, non-party ISS-Aviation-Guyana (as the name implies a Guyanese corporation) was the owner of the property at issue – the hangar. That entity purchased the property from ISS-DE in 2013. [D.E. 1 ¶65]. Barker and his U.S. entity ISS-DE had purchased the hangar originally from a company called Trans Guyana back in 2011 (after Barker had been using the hangar through a lease agreement dating back to 1999). [D.E. 1 ¶¶63-64]. *After the alleged expropriation* in 2017, the then-owner of the hangar ISS-Aviation-Guyana sold its interest in the hangar to its parent company, ISS Aviation (U.S.), which owns that interest to the present day.

Based on these intra-corporate transactions, Count III alleges a claim for unjust enrichment on behalf of ISS Aviation (U.S.) arising from the unlawful seizure of the hangar by Defendants in March 2017. [D.E. 1 ¶¶ 122, 193]. But ISS Aviation (U.S.) was not the party from whom the property was taken back in 2017. For purposes of the expropriation exception, that technicality is quite significant. This exception to the FSIA does not apply when nations take from their own citizens. The Supreme Court applied that principle in *Phillips,* 592 U.S. at 187 ("the phrase 'rights in property taken in violation of international law,' as used in the FSIA's expropriation exception, refers to violations of the international law of expropriation and thereby incorporates the domestic takings rule.") (reversing denial of motion to dismiss filed by heirs of German art dealers for expropriated property by Germany under the rule that what a country does to property belonging to its own citizens within its own borders is not subject to international law).

The domestic takings rule has been a settled, long-standing element of international law for some time. *See, e.g., Chuidian v. Philippine Nat. Bank*, 912 F.2d 1095, 1105 (9th Cir. 1990), *abrogated by Samantar v. Yousuf*, 560 U.S. 305, 130 (2010) ("Expropriation by a sovereign state of the property of its own nationals does not implicate settled principles of international law.") (citations omitted); *see also Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 708-9 (9th Cir. 1992) (finding one plaintiff, an Argentinian citizen living in the United States, ineligible to sue while allowing a second plaintiff, an American citizen, with an equal stake in the allegedly expropriated property to advance the claim).

Indeed, the Eleventh Circuit interpreted this rule recently in a case involving the alleged expropriation of property under somewhat similar circumstances, *Comparelli v. Republica Bolivariana De Venezuela*, 891 F.3d 1311 (11th Cir. 2018) (seizure of petrochemical plant by Venezuelan authorities under the guise of a criminal investigation into illicit storage of controlled substances). The case considered an argument on a motion to dismiss challenging the plaintiffs' reliance on the expropriation exception because "when a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law. . . . At their core, such claims simply are not international." *Id.* at 1320 (citations omitted). The Court explained that nationality for purposes of this Rule is determined by the principles that the sovereign state recognizes as indicative of nationality, which for dual citizens presents a fact-based question as to how the national treats dual nationals and how the national individually characterized himself. The case was then remanded for further fact finding. *Id.* at 1323.

The district court on remand determined that, for this inquiry, the crux of the issue focuses on what nationality at the time of the expropriation. *Comparelli v. Boliviarian Republic of Venezuela*, 655 F. Supp. 3d 1169, 1185 (S.D. Fla. 2023) ("Therefore, the Court must determine what J. Comparelli's nationality was on the date—November 23, 2010—that the alleged expropriation (Defendants' seizure of Marivelca and Trans Benz) occurred."). The Court's thorough analysis concluded that the Court could not deem a foreign national as a U.S. citizen or entity based on circumstances that took place *after* the alleged expropriation took place. That follows

from the Supreme Court's decision narrowing the reach of the expropriation exception only to cases where "the [plaintiff's] relevant factual allegations . . . make out a legally valid claim that a certain kind of right is at issue (*property* rights) and that the relevant property was taken in a certain way (in violation of international law)." *Bolivarian Republic of Venezuela v. Helmerich & Payne International Drilling Co.,* 581 U.S. 170, 174 (2017) (emphasis in original).

Judge Williams's analysis is undoubtedly correct in light of the Supreme Court's emphasis on the requirement that the sovereign's alleged taking must have been a specific violation of a principle or rule of international law at the time it took place. International law cannot be implicated and cannot trigger application of the exception unless and until a foreign national's property was wrongly appropriated.  If that property belonged to the sovereign's own citizens, "international law" could not possibly be implicated. The legal dispute would be purely "domestic" in that case.

So what does this mean here? To begin with, Plaintiff Barker is not a party to the claims in the Complaint, Count I and III, implicating a wrongful taking of the hangar in 2017. Only Plaintiff ISS Aviation (U.S.) is a party to the claim with respect to the hangar. But Plaintiff ISS Aviation (U.S.) is not alleged to have owned the hangar in March 2017. The complaint clearly alleges that in March 2017 ISS-Aviation-Guyana owned the hangar. That entity, though a subsidiary of ISS Aviation (U.S.), was *not* a foreign national as it clearly was a Guyanese entity on that date. So under the "domestic takings rule" that entity would be barred from asserting any

33

claim in this Court under the expropriation exception. No international law violation could be alleged by this domestic entity against Guyana.

Plaintiffs try to muddy the waters in the complaint and the response to the motion by claiming that this entity was just an arm of the parent at the time of the expropriation. And regardless, it sold its rights to the property in 2018 so the proper party in interest with standing to assert a takings claim for the hangar is ISS Aviation (U.S.). Not surprisingly, Plaintiffs' response cites no authority for this theory as to the expropriation of tangible property, like a hangar. Instead, Plaintiffs claim that their takings claim falls within the category of an "indirect" expropriation as if Defendants had taken over management and control of the corporate entity itself, akin to the situation found in *Helmerich* on remand from the Supreme Court's decision, 153 F.4th 1316, 1326 (D.C. Cir. 2025).

There are many problems with this theory, most glaring of which is that the complaint does not allege any corporate takeover of control over the corporation. In *Helmerich*, that plaintiff alleges a slew of expropriation measures designed to take over a going concern lock, stock and barrel. 153 F.4th at 1323–24 ("PDVSA employees and the Venezuelan National Guard blockaded the drilling operations of Helmerich (Venezuela) to prevent removal of the rigs. PDVSA issued press releases claiming to have 'nationalized 11 drilling rigs' belonging to Helmerich (Venezuela), which it said would henceforth be 'operated by PDVSA as a company of all Venezuelans.' . . . A PDVSA official confirmed that '[t]he workers are guarding the drills.' . . . The Venezuelan National Assembly issued an official declaration recommending that the

property be expropriated for the 'public benefit and good.' . . . And President Hugo Chávez issued a 'Decree of Expropriation' ordering Helmerich (Venezuela) to transfer the rigs to PDVSA under a Venezuelan 'Law of Expropriation.' . . . PDVSA then began using Helmerich (Venezuela)'s rigs and other assets to drill.").

It is non-sensical to compare these allegations, which prompted the D.C. Circuit to apply a rule of "indirect expropriation," to a situation where a particular piece of tangible property like a hangar and its aircraft are padlocked and then seized. One is not like the other, not even close.

Second, even if we could disregard the corporate forms at the time of the alleged expropriation as easily as this, that would still not help Plaintiffs here. The beneficial owner of ISS-Aviation-Guyana as well as ISS Aviation (U.S.) is still Barker. And he was also a dual citizen of Guyana at the time of the alleged taking, who held himself out as such as the complaint makes clear. So in this case, unlike *Helmerich*, the end result would be the same. The alleged expropriation took place of a beneficial owner of a corporation who was a citizen of Guyana. No "international law" violation could thus have taken place in March 2017.

Third, the other glaring problem is that this complaint does not allege an expropriation in terms that *Helmerich* or cases like it would understand. Instead, the complaint alleges conduct that is fundamentally different. As paragraph 196 of the complaint makes clear, "Defendants finalized their decision to seize the Hangar, two aircraft, and aviation equipment in August and September 2021, when, in calls facilitated by the U.S. Embassy in Guyana, Defendants considered Plaintiffs' request

to return the Hangar, two aircraft, and assets to Plaintiffs. Defendants asserted that the property was seized due to (1) nonpayment of the lease on the Hangar, (2) because they were authorized by an injunction entered by a Guyana court, and separately on the September 2021 call, (3) orders from a Guyana bank."

It follows, then, that the complaint is not alleging an expropriation under the authority of a sovereign taking over control of national assets, as Hugo Chavez did in *Helmerich*. These allegations are instead raising a private act, akin to a domestic foreclosure, based on legal proceedings in a foreign jurisdiction. That is not, however, an "expropriation" under the statute that is "a uniquely sovereign act, as opposed to a private act." *Comparelli,* 891 F.3d at 1319 (citing *Devengoechea,* 889 F.3d at 1228). And the D.C. Circuit would agree with that as well. *Helmerich,* 153 F.4th at 1324 (denying *en banc* review because "[w]e were careful to note that 'not every state action that has a detrimental impact on a shareholder's interests amounts to an indirect expropriation.'").

And this latter problem also addresses the separate issue of the taking of the aircraft within the hangar. That property may have been owned at the time of the expropriation by ISS-DE; however, the seizure of this property for non-payment of a lease and a resulting court order does not give rise to an expropriation in violation of international law. It certainly could give rise to a legal claim, but any such claim would fall – as it does – under the commercial activity exception. There is no allegation in this complaint that could plausibly give rise to an expropriation theory because no assertion of sovereign power has been asserted with respect to this

36

tangible property.   To paraphrase the Eleventh Circuit's reasoning in *Devengoechea*, a party can certainly plead both types of exceptions as alternative theories in a complaint. But "calling an action expropriation does not make it expropriation as a matter of law. Rather, . . . FSIA expropriation has a very precise meaning, and on this record [Guyana's] actions do not satisfy it. For that reason, this is not a case where a plaintiff recast what is truly an expropriation claim as a commercial-activity claim. . . . [N]othing in this record supports the notion that [Guyana] came into possession of or refused to pay for or return [ISS property] through the exercise of its sovereign 'takings' power. Rather, [Guyana] acted in the same way that any private foreign [servicer] could have when it committed the acts that harmed [ISS]." 889 F.3d at 1230 (citing *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1326–27 (11th Cir. 2003) (holding that Pakistan's actions in seizing the plaintiff's land in that country and using it for military purposes was not commercial activity but expropriation because it made use of the state's sovereign authority at the time of the taking of the property in order to expropriate the property)).

In sum, the expropriation exception does not apply to the facts alleged in this complaint, notwithstanding the claim that the seizure of Plaintiffs' property amounted to a taking. That "taking" may be the damage caused by contract or tortious acts committed as part of Guyana's commercial activity having a direct effect in the United States. That is as far as this complaint can go under the FSIA. The expropriation exception falls outside the scope of these claims. To the extent Guyana is immune in this case, the commercial activity exception is what we must rely on.

### III.   ANALYSIS OF REMAINING ISSUES

#### A. *12(b)(6) Motions*

##### 1.   Plaintiffs' Breach of Contract Claim is Time Barred

Defendants argue that all of Plaintiffs' claims are time barred because the FSIA requires federal courts must apply the local forum's statute of limitations laws. [D.E. 30 at 8 (citing *Armada v. Republic of Colombia*, 821 F. Supp. 2d 268, 272 (D.D.C. 2011) (citing *Gilson v. Rep. of Ireland*, 682 F.2d 1022, 1025 n.7 (D.C. Cir. 1982))]. On this point, Plaintiffs concede only that the breach of contract claim with respect to the hanger lease agreement is time-barred under Florida's statute of limitations [D.E. 46 at 17]. The motion to dismiss Count II of the complaint is thus GRANTED without objection.

##### 2.   Plaintiffs' Takings/Conversion Claim is Not Time Barred

Though we have found above that a claim for conversion is viable under the commercial activity exception of the FSIA, the next issue presented in the motion is whether this "takings" claim is barred under Florida's statute of limitations. Defendants argue that all related claims are time-barred, but we will start with the takings claim in Count I, which Plaintiffs allege is based on the wrongful seizure of Plaintiffs' hangar and aircraft, i.e. a conversion of property. Defendants argue that the statute of limitations for this claim must be governed by Florida state law given this forum. And under Fla. Stat. § 95.11(3) this claim, to the extent it is tantamount to a tort claim under Florida law, is governed by the four year statute for actions for

38

"taking, detaining or injuring personal property" or "actions for trespass on real property" as well as "any other intentional tort."

Consequently Defendants maintain that the limitations period bars this action as a matter of law because the property at issue would have been converted in 2017 when the hangar and aircraft were seized per court order. At that point Plaintiffs lost possession and control of their property, thereby giving rise to a cause of action for common law conversion. As the claim accrued at that time, this action is barred as a matter of law because it was not filed in this jurisdiction until eight years later in June 2025 – four years beyond the limitations period authorized by Florida law.

Conversion is an "act of dominion wrongfully asserted over another's property inconsistent with his ownership therein." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (citing *Thomas v. Hertz Corp.,* 890 So. 2d 448, 449 (Fla. 3d DCA 2004)). The tort "may occur where a person wrongfully refuses to relinquish property to which another has the right of possession," and it "may be established despite evidence that the defendant took or retained property based upon the mistaken belief that he had a right to possession, since malice is not an essential element of the action." *Mazer*, 556 F.3d at 1270 (quoting *Seymour v. Adams,* 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994)); *see, e.g., BluestarExpo, Inc. v. Enis*, 568 F. Supp. 3d 1332, 1348 (S.D. Fla. 2021) ("Under Florida law, a conversion is an unauthorized act which deprives another of his property permanently or for an indefinite time.").

So in this sense the tort of conversion occurs the moment one intentionally refuses to return property to its rightful owner. *See, e.g., Matienzo v. Mirage Yacht,*

*LLC*, No. 10-22024-CIV, 2011 WL 1375684, at *5 (S.D. Fla. Apr. 12, 2011) (Huck, J.) ("The elements of conversion are: '(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein.") (quoting *Gemb Lending, Inc. v. RV Sales of Broward, Inc.,* No. 09–61670–CIV, 2010 WL 3385343, at *6 (S.D. Fla. Aug. 25, 2010)); *Special Purpose Accts. Receivable Co-op Corp. v. Prime One Cap. Co.,* 125 F. Supp. 2d 1093, 1099 (S.D. Fla. 2000) ("Florida courts have divided this description into three elements: (1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein.").

And a cause of action for conversion in this traditional sense does not require proof of demand, though evidence of a demand is certainly evidence of the wrongful possession of property. *Matienzo,* 2011 WL 1375784 at *5 (citing in part *Goodrich v. Malowney,* 157 So.2d 829, 832 (Fla. 2d DCA 1963) (conversion can be shown when the "act complained of amounts to a conversion regardless of whether a demand is made."); *see also National Union Fire Ins. Co. of Pa. v. Carib Aviation, Inc.,* 759 F.2d 873, 878 (11th Cir. 1985) ("The essence of the tort is not the acquisition of the property; rather, it is the wrongful deprivation.").

For purposes of applying a statute of limitations for such a claim, a conversion claim under Florida law accrues "when the last element constituting the cause of action occurs." Fla. Stat. § 95.031.[9] When the property at issue is taken from the

---

[9]   This statute governs because this claim is based on state law and the applicable limitations period for a conversion claim must then be bound by Florida law. *See, e.g., Ducat Fla., LP v. Wells Fargo Bank, N.A.*, No. 12-23683-CIV, 2013 WL

lawful owner, and the wrongdoer begins to exercise dominion and control over that property, the conversion accrues. "Under Florida law, a cause of action accrues, for statute of limitations purposes, when the last element constituting the cause of action occurs. As to the tort of conversion, that act constitutes the exercise of wrongful dominion and control over the property to the detriment of the rights of its actual owner." *Gomez v. BankUnited*, No. 10-21707-CIV, 2011 WL 114066 *5 (S.D. Fla. Jan. 13, 2011). So gaining possession is not sufficient; it is the possession coupled with the intent to deprive the person entitled to possession of her property that matters. *See, e.g., Brand v. Old Republic Nat. Title Ins. Co.*, 797 So. 2d 643, 646 (Fla. 3d DCA 2001) ("The essence of conversion, however, is not the possession of property by the wrongdoer, but rather such possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possession of the property.") (citing in part *Wilson Cypress Co. v. Logan,* 120 Fla. 124, 127, 162 So. 489, 490–91 (Fla. 1935) (conversion consists of a taking with intent to exercise ownership inconsistent with owner's right of possession)).

Based on the allegations in this complaint, the initial seizure of the Plaintiffs' property took place in March 2017. One cannot determine, however, from the face of the complaint if Defendants' intent to wrongfully possess the property materialized simultaneously with the seizure. The complaint itself alleges that Plaintiffs were immediately advised that the hangar was padlocked based on a court order. [D.E. 1

6667038 (S.D. Fla. Oct. 24, 2013), *report and recommendation adopted in part*, 2013 WL 6667033 (S.D. Fla. Dec. 17, 2013).

¶¶ 120-23. Plaintiff ISS was sued in Guyana in 2016 and a court ordered inspection of the property took place. Then the hangar and aircraft were seized. Months later, Plaintiffs' counsel learned that in September 2017 Defendant CJIAC wrote a letter to ISS claiming that ISS should vacate its property from the hangar by December 2017 because Defendant was taking over the hangar. [D.E. 1 ¶ 124].

Plaintiffs allege that this notice was never timely submitted to them from Defendants who simply placed the letter in their file without Plaintiffs' knowledge. This allegation now gives rise to a fair inference that by this point, December 2017, Defendants retained Plaintiffs' property and intended to deprive Plaintiffs of their property from that point on. As Plaintiffs allege that such intent was wrongful because Plaintiffs had been demanding all along for their return of the property, the cause of action for a traditional conversion action accrued at the latest by December 2017.

The statute of limitations for this conversion claim thus expired in December 2021. Defendants appear to have a point that the claim cannot be lawfully asserted now in June 2025, over three years after the expiration of the limitations period. That assumes, however, that the only cause of action Plaintiffs could assert relates to the original seizure and deprivation of Plaintiffs' property that occurred in 2017. Though Plaintiffs only indirectly addressed this issue, focusing instead on a continuing tort theory that has no relevance in this context, the Court's research identified another

potential conversion cause of action that the allegations in this complaint could support.[10]

Florida law also recognizes another type of conversion can give rise to a claim. Florida courts affirm that the wrongful *sale* of property that belongs to another is also a conversion. *See Bove*, 382 So. 2d at 452 (citing *Klein v. Newburger, Loeb & Co.,* 151 So. 2d 879 (Fla. 3d DCA 1963)); *McMurrain v. Fason*, 584 So. 2d 1027, 1034 n.8 (Fla. 1st DCA 1991) ("The wrongful sale of personal property of another amounts to conversion."); *Robinson v. Hartridge*, 13 Fla. 501, 514 (1869) ("The act of selling the property of another without his authority is an assumption of a right of the highest and most unequivocal character. A person selling property acts at his peril. If he assumes such authority over the property of another without the owner's consent, that he does not know the true owner will not avail him, nor will the actual retention

---

[10]   Plaintiffs treat the original conversion as a continuing tort that extended the accrual period through the date when a "final" mediation took place in 2021 where Defendants advised that they would not be returning the property. There is no support for the conclusion that a claim based on deprivation of possession of a tangible good does not accrue until negotiation efforts ultimately fail. Cases involving conversion of intangible funds like monies in a bank account are thus inapposite. And even if such a theory was plausible, the continuing torts doctrine would not be the right vehicle to pursue it. Instead that theory requires the existence of a delayed discovery exception to the tort of conversion. But Florida courts have already rejected that defense as a viable exception to the running of a limitations period for this type of tort. *Davis v. Monahan,* 832 So. 2d 708, 709 (Fla. 2002). Therefore, as the Eleventh Circuit recognized, the statute of limitations for a conversion claim only begins to run when a conversion occurs, unless the conversion was fraudulently concealed. *Wachovia v. Tien,* 658 F. App'x 471, 476 (11th Cir. 2016) (citing *Davis* and *Bove v. PBW Stock Exch., Inc.,* 382 So. 2d 450, 452–53 (Fla. 2d DCA 1980)). The original conversion alleged in the complaint occurred no later than December 2017 and that was known to Plaintiffs at that time.

of the proceeds for the true owner avail him as a defence. This cannot justify the assumption of dominion over the property, or avoid or excuse the conversion, which is the result of the act of sale."); *cf. Gokalp v. Unsal*, 284 So. 3d 1097, 1098 (Fla. 4th DCA 2019) ("It is undisputed that Gokalp and his corporation received no money from the sale of these properties so there was not sufficient evidence against them to support the conversion and civil theft damages of $167,000.").

So, for instance, conversion arises when an owner of property sells collateralized property without consent. In that case, an action for conversion by the secured lender is an available remedy. See *Taylor Rental Corp. v. J.I. Case Co.*, 749 F.2d 1526, 1529 (11th Cir. 1985) ("an action for conversion is a proper remedy for a secured party to bring against a third party when its collateral has been disposed of by the debtor.").

Similarly, if after having lawfully obtained possession of property, the user then destroys or abandons the property to the detriment of the lawful owner, a conversion also follows. As the Eleventh Circuit found, "[t]he wrongful destruction . . . of personal property by a bailee, contrary to the terms [of the bailment], terminates the trust . . . and [an] action for conversion will lie." *Nat'l Union,* 759 F.2d at 878 (finding insurance coverage for conversion applied where leased aircraft was "ditched" in the ocean with contraband; "In our view, Marchand's unauthorized *use* of the aircraft, culminating in its destruction, constitutes conversion under Florida law.") (emphasis added).

44

And, of course, a series of acts evidencing the exercise of dominion of another's property can all amount to a conversion. That is the type of conversion this Court recognized in a case involving a fraud and conversion claim over an interest in a hotel. *Rubinstein v. Yehuda*, 38 F.4th 982, 1000-01 (11th Cir. 2022). There, limitations and other defenses were raised to the wrongful claim of ownership to a hotel in late 2015. Defendants argued that plaintiff knew what was going on during 2016 and 2017, yet this court found, and the Eleventh Circuit affirmed, that plaintiff's knowledge of acts furthering a conversion did not preclude a conversion action once the hotel had been sold. "True, the [defendants'] tortious conduct began well before the sale of the hotel. Their efforts to convert Rubinstein's interest in Oceanside, for example, began as early as November 2015 when they filed documents with the State of Florida. But those filings did not complete [their] efforts to convert Rubinstein's majority ownership interest. Rather, the[y] took a series of actions—filing annual statements, forging documents, opening bank accounts, and so forth—to wrest control of that interest, and those efforts culminated in the hotel sale. There was no evidence that, once those efforts succeeded, the resulting damages were magnified by Rubinstein's inaction. Nor would it make any sense to say that Rubinstein's failure to stop the[m] from converting his property was a failure to mitigate his fraud damages.") (affirming judgment for fraud and conversion of $1.5 million).

Here the allegations in this complaint plausibly support an inference that, having gained possession of Plaintiffs' property in 2017, Defendants ultimately benefitted from that possession through the sale or use of the property for their

45

financial benefit at some later point in time. This culminated, for instance, in a final act of conversion at the point that this wrongful conduct yielded a sale of the property and those funds were not returned to Plaintiffs. And that would amount to a conversion *even if* the Defendants were to claim that the initial seizure of the property was legally permissible at the time. Having gained access to another's property and later disposing of that property without compensation to the original owner would still amount to a conversion in whatever sum a trier of fact deemed reasonable based on the value of the property at the time of the conversion. *See, e.g., Small Bus. Admin. v. Echevarria*, 864 F. Supp. 1254, 1267 (S.D. Fla. 1994) ("Under Florida law, damages for conversion are limited to the reasonable value of the property when converted.") (citing *Gillette v. Stapleton,* 336 So. 2d 1226, 1227 (Fla. 2d DCA 1976); *Lilly v. Bronson,* 129 Fla. 675, 177 So. 218 (Fla.1937)); *Grimes v. Holt*, 225 So. 2d 566, 569 (Fla. 3d DCA 1969) ("As a general rule the measure of damages for the conversion of personal property is the value of the property at the time of the conversion.").

The face of the complaint, however, does not allow any definitive ruling on either a limitations defense or any other defense to the conversion claim arising from Defendants' ultimate use or sale of the property. Additional development of the record will be necessary. But we find that these allegations, in the light most favorable to Plaintiffs, allow for the Court to find that a plausible claim of conversion lies against Defendants from the seizure *and* ultimate disposition of Plaintiffs' property.

Consequently, a motion to dismiss based on the affirmative defense of a limitations period cannot be granted. The general rule governs. At the motion-to-

dismiss stage, a complaint may be dismissed on the basis of a statute of limitations defense "only if it is 'apparent from the face of the complaint that the claim is time-barred'" and "only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." *Tello v. Dean Witter Reynolds, Inc.,* 410 F.3d 1275, 1288, 1288 n.13 (11th Cir. 2005) (quoting *La Grasta v. First Union Secs., Inc.,* 358 F.3d 840, 845 (11th Cir. 2004)). No such finding can be made on the face of this complaint as Plaintiffs may indeed be able to prove a series of facts that, rather than tolling a statute, give rise to multiple acts of conversion from which damages may follow.

Accordingly, the motion to dismiss conversion claims, which we find adequately alleged in Count I of the complaint, is DENIED.

### 3. Plaintiffs' Unjust Enrichment Claim is Not Time-Barred

For many of the same reasons, Defendants unpersuasively argue that the complaint's unjust enrichment claim, found in Count III, should be dismissed. In the first place, Defendants claim without support that the FSIA does not permit unjust enrichment claims [D.E. 30 at 14]. Plaintiff correctly responds that jurisdiction for unjust enrichment arises under the commercial activity exception already analyzed above. [D.E. 46 at 18]. The Eleventh Circuit agrees. *Devengoechea*, 899 F.3d at 1225. Therefore, we agree.

Defendants then argue that even if jurisdiction is established, the unjust enrichment claim is time-barred because, although subject to laches, the breach-of-contract claim upon which the unjust enrichment claim depends was not commenced within the five-year statutory limit under Fla. Stat. § 95.11(7). [D.E. 30 at 8-9].

47

Plaintiffs counter that because the unjust enrichment claim is based on a quasi-contract, Fla. Stat. § 95.11(3) establishes a four-year statute of limitations that accrues when the cause of action's final element occurs. [D.E. 46 at 18-9 (citing *Merle Wood & Assoc., Inc. v. Trinity Yachts, LLC*, 857 F. Supp. 2d 1294, 1309 (S.D. Fla. 2012) (citations omitted)). And they conclude that the final element of this claim occurred within four years of the filing of the action so the limitations defense cannot prevail.

Under Florida law, a plaintiff asserting a claim of unjust enrichment must prove:

> (1) the plaintiff must have conferred a benefit on the defendant; (2) the defendant must have knowledge of the benefit; (3) the defendant must have accepted or retained the benefit conferred; and (4) the circumstances must be such that it would be inequitable for the defendant to retain the benefit without paying fair value for it.

*Kaye v. Ingenio, Filiale De Loto-Quebec, Inc.*, No. 13-61687-CIV, 2014 WL 2215770, at *9 (S.D. Fla. May 29, 2014) (citing *Merle Wood & Assoc., Inc.*, 857 F. Supp. 2d at 1237 (citations omitted)).

We find that Plaintiffs have also plausibly alleged that they have satisfied these elements, especially at the motion to dismiss stage. A fair inference can be drawn from the complaint that Defendants are continuing to hold the assets and continue to be unjustly enriched by them to this day. If so, the limitations period cannot be deemed to have run on an equitable claim for damages flowing from their unjust enrichment.

Moreover, Plaintiffs also contend that the unjust enrichment was not complete until September 2021 because that was the last attempted negotiation between Plaintiffs and Defendants to return the assets. [D.E. 46 at 19]. Plaintiffs argue that their claim is supported further because there were multiple negotiation attempts after the 2018 chaining event, continuing through September 2021, with the U.S. Embassy engaged in negotiations on Plaintiffs' behalf. [D.E. 46 at 19]. As further evidence the complaint states that Defendants called Plaintiffs in October 2020 regarding a burglary within the CJIA Hangar. [D.E. 46 at 19]. It is therefore plausible that Defendants did not consider themselves owners until at least some point after October 2020; otherwise, why inform Plaintiffs at all? We can then assume for purposes of this Motion that negotiations to obtain the assets continued until September 2021, and that we can establish then as when it became "inequitable for the defendant to retain the [assets] without paying fair value for [them]." *Kaye*, No. 13-61687-CIV at *9 (citations omitted). A trier of fact could find otherwise, of course, but that determination cannot be made as a matter of law on a motion to dismiss. A plausible argument exists here that the limitations period on the unjust enrichment claim did not expire prior to the filing of this complaint.

And, consistent with the Court's analysis of the conversion claim, the assets may ultimately have been disposed entirely within four years of the filing of the complaint. The financial benefit that Defendants may have gained in that instance

49

would have occurred within the limitations period (assuming Florida law applied).[11] And a trier of fact could then determine that it would be unjust and inequitable for Defendants to profit from the benefits conferred on them by Plaintiffs.

In sum, the Court cannot find as a matter of law that the unjust enrichment claim is time-barred. The motion as to Count III is thus DENIED.

### 4. Plaintiff's Negligence Claim is not Plausible

Count IV of the Complaint purports to assert a negligence claim. Defendants challenge this claim on multiple fronts, including the argument that Defendants cannot assert a negligence claim because there was no established duty of care to the Plaintiffs. [D.E. 30 at 14]. Plaintiffs responded that the negligence claim was operatively a conversion claim under Florida law. [D.E. 46 at 19]. But we have already deemed their "takings" claim in Count I to be tantamount to a conversion claim under Florida law. So, at a minimum, Count IV should not be treated as a rehashed conversion claim. And as Plaintiffs have no other persuasive response to the motion to the extent that they are actually asserting a negligence theory, Defendants' motion has merit.

---

[11]     Neither party has argued otherwise at this point. But the Court notes that some or all of the claims may be governed by the law of Guyana if that jurisdiction is deemed to have the most substantial relationship to the claim or claims alleged. That issue may have to be addressed at a later date. *See, e.g., Doe v. Roe*, No. 20-14456, 2022 WL 1447378, at *2 (11th Cir. May 9, 2022) (internal quotations omitted) (citations omitted) ("A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state. Florida courts apply different choice of law rules to different areas of the law. Florida utilizes the 'most significant relationship' test to determine which state's law applies to tort claims. But in determining which state's law applies to contracts, Florida courts have long adhered to the rule of lex loci contractus.").

Therefore, the motion to dismiss Count IV is GRANTED.

### 5.  A Claim for Attempted Extrajudicial Killing in Violation of Federal Law was Plausibly Pleaded

Count V asserts that Defendants are also liable for damages under the Torture Victims Protection Act. Plaintiff has alleged that individual[s] acting under the authority of the state (of Guyana) subjected Barker to torture, compensable under 28 U.S.C. § 1350 note, Sec. 2. The TVPA includes in its definition of torture "any act . . . by which severe pain or suffering . . . is intentionally inflicted on that individual for such purposes as . . . punishing that individual for an act that individual . . . has committed or is suspected of having committed, intimidating, or coercing that individual for a third person[.]" 28 U.S.C. § 1350note, Sec. 3.

The facts alleged in this complaint, surrounding the alleged incidents from which the TVPA claim is based, may be peculiar but they are also specific, circumstantially supported, and not implausible on their face. Count V alleges that, under actual or apparent color of law, Defendants acted through unknown individuals that undertook substantial steps to attempt to kill Barker. They gained authorizing access to the secure area of the airport from which they tried to sabotage Barker's aircraft. Had this sabotage not been timely discovered, Barker may have been killed or injured. The complaint further alleges that Defendants Ghir and another unknown individual tried engaged in another attempted extrajudicial killing by, again, gaining access to a secure area of the airport from which they tried to sabotage Barker's

51

vehicle. This too could have killed or seriously injured him, which harm is compensable as a means of "torture" under the TVPA.

Skeptical as we may be as to the ultimate viability of these claims, we cannot find that they have not been adequately alleged for purposes of this motion. This is so even if Barker cannot identify the actual perpetrators responsible for his harm. A fair inference can be drawn that those perpetrators had a connection with Defendants as they operate a major airport that presumably implements strong security measures. Both incidents allegedly occurred when Barker's property was within the airport's security zones. [D.E. 1 at 27-9]. It is therefore also plausible no individuals would have access to the premises other than CJIA personnel or those it approved, and that CJIA would have records of who entered the secured zones at the times of the alleged incidents. For these reasons, the motion to dismiss Count V must be DENIED.

### B. *12(b)(1) Motion*

### *This Court Has Subject Matter Jurisdiction with Respect to the Claims Arising under Defendants' Commercial Activities*

Plaintiff has plausibly pleaded that Defendants engaged in commercial activities that resulted in a breach that had a direct effect in the United States. Plaintiffs plead that Defendants constructively breached their contract by limiting Plaintiffs' and their employees and agents access to the CJIA Hangar, most significantly through the 2017 chaining of the hangar. Plaintiffs' business activities were substantially in the United States. It is therefore probable, given the nature of

the relationship between Plaintiffs and Defendants, that Defendants were, if Plaintiffs' claims are to be believed, knowingly disrupting Plaintiffs' business activities in the United States. In addition to lost business deals, which we must discount as speculative, Plaintiffs regularly chartered flights to and from the United States. Not only could Plaintiffs not effectively use the CJIA hangar, but they couldn't use the aircraft within it, since those required regular inspections to retain FAA certification. 14 CFR § 135.25(a)(1) (requires certification for all aircraft operated in the United States by a FAA approved certificate holder (i.e., a certified pilot); FAA 8130.2J Chg 1 (10/27/2023) (registration requires a physical examination of the aircraft to receive an airworthiness certificate). With that said, Plaintiffs concede their breach of contract claim is time barred. However, Plaintiffs' ancillary claims that depend on the breach remain unless dismissed on other grounds.

Plaintiffs have also plausibly claimed that Defendants engaged in conversion of property that are sufficiently engaged in commercial activities in the United States. The assets are (in part) highly regulated aircraft registered in the United States. The fact that Plaintiff Barker and his companies engaged in several years of business with Defendants Guyana, CJIA and Ghir is sufficient to conclude that Defendants knowingly engaged in commercial activities in the United States. Guyana allegedly employed and depended on Barker and his companies' resources to carry out their law enforcement operations, which supposedly required travel back and forth between the two countries. Guyana purchased American aircraft from Barker and his companies, and they further used his businesses to service their aircraft.

53

Further, CJIA regularly facilitates flights to and from the United States. Ghir is CEO of CJIA. CJIA and Guyana are sufficiently engaged in commercial activities that touch upon the facts and claims in this case.

We incorporate the Court's discussion in Section II above and deny the motion to dismiss for lack of subject matter jurisdiction in accordance with that analysis.

### C. _12(b)(3) Motion to Dismiss for Improper Venue_

Defendants argue that, because all relevant activities physically occurred in Guyana and the assets are in Guyana, venue is improper. [D.E. 30 at 17]. But Defendants' motion for improper venue lacks merit.

Plaintiffs argue venue is proper under 28 U.S.C. § 1391(f)(3), permitting venue "in any judicial district in which the agency or instrumentality is licensed to do business or is doing business[.]" [D.E. 46 at 21-2]. Plaintiff recognizes that § 1391(f)(3) is limited to state instrumentalities while § 1391(f)(4) focuses on foreign states _qua_ states (providing jurisdiction in the D.C. District Court for all FSIA suits against "a foreign state or a political subdivision thereof"). [D.E. 46 at 22] But Plaintiff argues that the case law has construed the two provisions interchangeably. [D.E. 46 at 22]. While the Eleventh Circuit has not provided an applicable ruling on the matter, we find Plaintiffs' reliance on other circuit precedent convincing.

Both this District and the D.C. District Court are appropriate venues to rule on Plaintiffs' claims. _See_ A_ltman v. Republic of Austria_, 317 F.3d 954, 971 (9th Cir. 2002) ("Where, as here, both the foreign state and its instrumentality are sued in the same suit, both venue provisions are potentially available.") _Altmann_ considered the

54

Central District of California ("Central District") an appropriate venue because the Austrian Gallery, an Austrian "agency or instrumentality" defendant sued alongside Austria, *id.* at 972, distributed publications and advertisements in the Central District that served as the basis for subject matter jurisdiction under the FSIA. *Id.* The panel in *Altmann* also noted that Austria deployed diplomats to its consulate in the Central District as facts favoring the appellee's venue argument. *Id.*

*Altmann* is sufficiently relevant to the facts in this case for purposes of venue. At least part of the subject matter jurisdiction for this case is based upon Defendants' memorandum of understanding with and acceptance of flights to and from Florida. Furthermore, Guyana also holds a consulate in Miami and deploys diplomats to serve in it. Defendants' reply does not provide any argument to the contrary. We therefore find venue proper with respect to Plaintiffs' claims on these bases.

Additionally, Plaintiff Barker resides in and operates his businesses from Florida. Plaintiffs have alleged that they suffered injuries in the United States, and we can presume that Florida would be the district in which they are most felt. Venue is proper under the FSIA "in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]" 28 U.S.C. § 1391(f)(1).

Accordingly, the motion to dismiss for improper venue is also DENIED.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss is **GRANTED** in part and **DENIED** in part. Plaintiffs' breach of contract and negligence claims, Counts II and

IV, are hereby **DISMISSED**. All other claims, as interpreted and applied in this Order, are not Dismissed. The court has subject matter jurisdiction under the commercial activities exception to the FSIA and venue is proper in this District.

> **DONE and ORDERED** in Chambers at Miami, Florida this 16th day of March, 2026.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge